IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VUSAL MANAFOV,

                 Petitioner,

      vs.

WILLIAM MUNIZ, Warden, Salinas
Valley State Prison,

               Respondent.

No. 2:15-cv-00439-JKS

MEMORANDUM DECISION

Vusal Manafov, a state prisoner represented by counsel, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Manafov is in the custody of the

California Department of Corrections and incarcerated at Salinas Valley State Prison.

Respondent has answered, and Manafov has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On August 15, 2011, Manafov and his co-defendant, Eugene Rice, Jr., were charged with

second degree robbery (count 1).  The consolidated information further charged Manafov with

another count of second degree robbery (count 2) and with personally using a firearm during the

commission of the robberies in counts 1 and 2.  Manafov and Rice proceeded to a joint jury trial

before two different juries.  On direct appeal of his conviction, the California Court of Appeal

laid out the following facts underlying the charges against Manafov and the evidence presented

at trial:

> ***August 7 Robbery at Penryn Valero (Manafov only)***
>       Sukhwant Grewal was working as a cashier at the Valero gas station in Penryn
> early in the morning of August 7, 2010.  At about 1:45 a.m., Manafov entered and robbed

him.  Manafov wore a sports cap covered with a black hood.  He took a burrito from the freezer, put it on the counter, and handed Grewal money.  When Grewal made change, Manafov showed Grewal a gun and demanded he hand over all the money, in a bag.  A video surveillance camera captured the robbery.

Grewal called 911 and the police arrived in about five minutes.  Grewal was unable to select the robber from a lineup, but was able to identify a similar gun.  The robber did not appear intoxicated.

### August 10 Robbery at Colfax Chevron

On August 9, 2010, Rice, Manafov, and Jarnee Rivers[FN2] left Oakland and went to Sacramento.  While there, Rice said they were going to "hit a lick," meaning commit a robbery.  They drove on Interstate 80 towards Reno.

> FN2.   At the time of the robberies, Rivers was in a romantic relationship with Manafov and was pregnant with his child.  At trial, she testified she was still in love with him, although by the time of trial she was pregnant with another man's child.

Just after midnight on August 10, 2010, the clerk at the Penryn 76 gas station and his girlfriend saw a car approach and slow down.  It first stopped near the entrance and then drove to the back where it stopped near an open door and the car's occupants looked inside.  The car was red with no license plates.  There were three occupants who all appeared to be male.  The driver wore a fur-lined hood and the person in back wore black.  The car sputtered off, as if the driver were unskilled in driving a manual transmission, and entered the freeway going east.  The clerk and his girlfriend thought it was suspicious and called the police.

Charles McIntyre was working at the Colfax Chevron station that morning.  The station is about 100 yards from the interstate.  A male customer, Manafov, entered around 1:00 a.m. and selected a beverage.  As McIntyre took his money and opened the cash drawer, Manafov produced a revolver.  He pointed it at McIntyre and told him to empty the registers, giving McIntyre a small black plastic bag for the money.  The robber was in his 20's and wore a black-hooded sweatshirt over a cap with red on it.  He repeatedly told the clerk to hurry up, that he was not fast enough.  The robber had a foreign accent.  As the robber turned to leave he told McIntyre to "have a nice day."  The robber took $1,377.  McIntyre identified Manafov as the robber from a photographic lineup.

Officer Jack Hickey was on patrol and responded to the early morning call from the Chevron station.  He watched the surveillance video of the robbery.  It showed a vehicle pull in the north end of the station and park.  A white male passenger walked to the store.  The driver wore a white baseball cap.  The car was red with no license plate.  It had a DMV sticker on the left rear window, and a sunroof.  Hickey gave a description of the suspect vehicle to dispatch.  The suspect was wearing a red Oakland A's cap, a black-hooded sweatshirt, and black pants and had a large wristwatch.  He had a black revolver and a black plastic bag for the money.

Almost a half hour after the dispatch, a CHP officer saw a red sedan with no license plates, a sunroof, and three people inside. He followed it, waiting for backup. The car took the Kingvale exit and stopped, and then got back on Interstate 80.

When backup arrived, the officers conducted a felony stop. Manafov was the driver, Rice the front passenger, and Rivers was in the rear seat. All three were arrested. Rice was wearing a white tank top with a blue outer shirt; both Rivers and Manafov were dressed in black. Manafov did not appear to be under the influence of drugs.

Red and white baseball caps were seized from the car. The white cap was later found to contain hairs consistent in length to Rice's hair. There were multiple items of clothing in the trunk, including a jacket with a fur hood, as well as license plates. A loaded, black revolver was found under the hood of the car. A black plastic bag with money was under the rear seat. An employee time card and a traffic ticket, both in Rice's name, were also found in the car.

Rivers testified that she was asleep during part of the drive, but awoke when Manafov and Rice changed places. She heard the trunk and the hood slam. Rice got in the passenger seat and handed her a black bag and told her to put it under the seat.

### Interview of Rivers

Detective Bill Summers interviewed Rivers. In the first interview, Rivers said she fell asleep outside Sacramento. At one point, the car pulled over and she heard the trunk slam. Rice was wearing a white shirt. She called him "Bra" (meaning brother) as he was like a brother to her. Someone passed her a black bag with money. Both Rice and Manafov drove; she did not see who went in the gas station.

Just before this interview ended, Rivers asked what was going to happen to her. The detective said she would be held for investigation of armed robbery. When the tape was turned off, Rivers told the detective that she saw Manafov, whom she referred to as Babe, come out of the Chevron. The tape was turned on and Rivers repeated it. She said Rice drove; she did not see anything until he pulled off and he and Manafov switched places and she heard the slamming. Rice passed her the bag. After this interview, as Summers walked Rivers to booking, she said she remembered something. Summers turned on the tape again and Rivers said that while in Sacramento, Rice said they were going to "hit a lick."

### Uncharged Robberies

At trial, the parties stipulated to two uncharged robberies committed by Manafov; this evidence was before only Manafov's jury. On July 26, 2010, at 4:20 a.m., Manafov entered a Valero gas station in West Sacramento and brought merchandise to the counter. He pointed a black revolver at the clerk and demanded money. After the clerk gave Manafov money, he left. Manafov's fingerprints were on the merchandise.

At 4:43 a.m. that same day, Manafov entered a AM/PM minimart in Davis and brought merchandise to the counter. Again, he pointed a black revolver at the clerk and demanded money. The clerk gave him money from the register and Manafov left. His fingerprints were on the merchandise he took to the counter.

***The Jail Note***

   About two months after the robberies while Manafov and Rice were in jail, an officer saw Rice approach a door between housing units and put a piece of paper through the door. Another inmate approached and pulled out the note. He set it on a table and pointed to Manafov, who took the note. Officers intervened and collected the note.

   The note read: "Congratulations on the baby. After my potne [sic ] seen Latifa and Kimora[FN3] Big Ass coming together, he put 2 & 2 together. Now he can see that you're getting at him with my lawyer and said shit. They're trying to get you home fast by making you go against my potne by making you think my potne going against you! That dude is a convict who live under oath with other convicts, so if he rat or get ratted on[,] his own oath will prevail & punish the "rat" in any CDC yard. His thinking is to ride it out with you for the best deal you can get, then subpoena you to court so you can testify for him and let them know he didn't drive or know what was going on. Then he could show this to his family in the pen that you should be our lil bra."[FN4]

   FN3.   Rivers was also known as Kimora. Latifa was Manafov's mother.

   FN4.   The People argued Rice "obviously" wrote this note, speaking of himself in the third person ("my potne"). The People explained the note's meaning as follows: Rice would not implicate Manafov because Rice lived by the "convict oath." If Manafov turned against Rice, he would be punished, but if he testified on Rice's behalf, Rice would offer him protection in prison.

***Testimony about Surveillance Videos***

   Surveillance video captured both the Valero robbery and the Chevron robbery. The video of the Chevron robbery was admitted into evidence as Exhibit 1 and played to both juries. The video of the Valero robbery was admitted into evidence as Exhibit 56 and played for Manafov's jury.

   Detective Summers testified the driver shown in the Chevron video was not consistent with Rivers's appearance. The driver wore a white hat and a white shirt and had short hair and was a large person. That description did not fit Rivers but was consistent with Rice, who was wearing a white tank top at booking. The detective could not determine the race of the driver from the video, but he looked darker than a white person or the passenger who entered the store (Manafov).

   Detective Michael Simmons testified he viewed both videos. The red Lexus shown in the Valero video was similar to the Lexus impounded after the Chevron robbery. They were both red and had the same light configurations and rims and neither had license plates. Other similarities were the sunroof and the DMV sticker in the rear window.

   After reviewing the two videos, Simmons noticed several similarities between the two robberies. The suspects both wore a black-hooded sweatshirt with a red baseball cap underneath with a white "A" insignia. "You had the same suspect, same height, same stature, same walk, same mannerisms." Simmons testified the behavior of the robber was

-4-

the same in each video.  The videos were also similar in the same respects to those in the (uncharged) West Sacramento and Davis robberies.  The only difference was the color of the bottom part of the clothing.  The same car was used in each robbery and in three, including the two most recent, the getaway driver began driving away before the robber was completely in the car.

### Rice's Defense

Rice's defense was primarily to attack the credibility of Rivers who testified he said they were going "to hit a lick."  To that end, he presented the testimony of a loss prevention officer about Rivers's shoplifting in 2009.

### Manafov's Defense

Manafov admitted he committed the Valero and Chevron robberies, but claimed he was forced to do so by Rice.  Manafov was 23 at the time of the robberies, while Rice was 42.  Manafov had met Rice five years earlier, but their relationship tightened in 2010. After Rice's wife threw him out of the house, Rice was always angry and spent more time with Manafov.  Rice had financial problems and suggested they rob people. The next day they picked up Rice's gun from a house in Vallejo.

Manafov claimed Rice made him ingest ecstasy and cocaine and that he was under the influence during each robbery.  Manafov felt he could not refuse.  He was afraid of Rice and knew that he had used a gun and attacked people.  Rice told him he had killed someone and spent six years in prison.  Manafov was concerned for his family and for Rivers.  Rice harassed Rivers and wanted her to have sex with him.  Rice had threatened Manafov with the gun before the Chevron robbery; Rice hit him with his hand and the gun.

Manafov never called the police about these threats.  Manafov never ran because Rice "has people who knew him."

Rivers testified Rice threatened Manafov "plenty of times."  Rice had snatched money from him and pushed him.  Rice was very intimidating and Rivers believed he had hurt her sister.  Like Manafov, Rivers never told the police about Rice's threats.

A police officer and a phlebotomist testified Manafov's blood was drawn at the jail.  A toxicology analysis showed no cocaine or other narcotics; the blood sample screened positive for marijuana.  Manafov denied anyone drew his blood.  He claimed he had never seen the phlebotomist before.

*People v. Manafov*, No. C069505, 2013 WL 5414106, at *1-4 (Cal. Ct. App. Sept. 27, 2013).

At the conclusion of trial, Manafov's jury found him guilty of both counts of robbery and found true the allegation that he personally used a firearm in committing each offense.  The trial court sentenced Manafov to an imprisonment term of 17 years and 4 months.[1]

Through counsel, Manafov appealed his conviction, arguing that: 1) Manafov's right to a fair trial was violated by the court's orders regarding his uncharged crimes; 2) trial counsel was ineffective for not moving to limit the admissibility of the uncharged crime evidence and for failing to timely seek the admission of Rice's jail note as evidence of Manafov's state of mind; 3) trial counsel was ineffective for presenting the implausible defenses of legal necessity and intoxication rather than focusing on Manafov's duress defense; 4) the trial court erred in admitting police opinion testimony regarding the identity of robbers in a surveillance video; and 5) trial counsel was ineffective for failing to object to the admission of that police testimony. The Court of Appeal unanimously affirmed the judgment against Manafov in an unpublished, reasoned decision issued on September 27, 2013.  *Manafov*, 2013 WL 5414106, at *15. Manafov petitioned for review in the California Supreme Court, which was summarily denied on December 18, 2013.  Manafov's conviction became final on direct review 90 days later, when his time to file a petition for *certiorari* in the Supreme Court expired on March 18, 2013.  *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Manafov timely filed a counseled petition to this Court on February 25, 2015.  *See* 28 U.S.C. § 2244(d)(1)(A).

---

[1]      Rice's jury found him guilty of the one count of robbery for which he was charged, and he admitted a prior conviction for voluntary manslaughter that qualified as both a strike and a serious felony.  Rice was sentenced to 9 years' imprisonment.

## II. GROUNDS RAISED

In his counseled Petition before this Court, Manafov raises the same arguments he unsuccessfully raised on appeal to the state courts, namely that: 1) the trial court erred in admitting evidence of uncharged robberies and allowing Detective Simmons to testify on the surveillance videos; and 2) trial counsel was ineffective for failing to timely seek the admission of Rice's jail note and for presenting multiple defenses.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.      *Evidentiary Errors* (Ground 1)

Manafov first challenges his conviction by arguing that the trial court made two reversible errors. The Supreme Court has acknowledged its "traditional reluctance to impose

constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.  *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted).  A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'"  *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)).

1.      Admission of uncharged robberies

Manafov contends that the trial court erred in admitting the evidence of his two uncharged robberies.  According to Manafov, the Court of Appeal erred in determining that there were sufficient similarities between the uncharged robberies and the charged offenses to permit the admission of the uncharged robberies to show identity pursuant to California Evidence Code § 1111.

However, the Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.  *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson*, 431 U.S. at 154; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  On direct appeal, the appellate court determined that, in line with the California Evidence Code and state case law, the trial court properly allowed the uncharged robberies into evidence.  This Court is bound by the state court's interpretation of California state law.  *Bradshaw*, 546 U.S. at 76.

Moreover, the United State Supreme Court has left open the question of whether state law would violate the Due Process Clause if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008).  As such, the Ninth Circuit has routinely found federal habeas relief to be foreclosed by § 2254(d)(1) for claims challenging the admission of evidence of prior bad acts or crimes.  *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006).

Here, because the propensity evidence was properly admitted under California law to prove Manafor's identity, and lacking any clearly established Supreme Court authority prohibiting admission of such evidence, it cannot be said that the Court of Appeal's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Accordingly,

-10-

Manafov is not entitled to habeas relief on his claim that the admission of his prior uncharged

robberies to prove identity violated his due process.

      2.        Allowing Detective Simmons' testimony on the surveillance video

      Manafov additionally argues that the trial court erred in allowing Detective Simmons to

opine at trial about the identify of the suspect in the surveillance videos.  The Court of Appeal

agreed with Manafov that the admission was error, but nonetheless found the error to be

harmless.  Manafov challenges that finding on the ground that Simmons' status as a police

officer unduly influenced the jury.

      Manafov's argument is unpersuasive.  The Court of Appeal concluded:

> It is not probable Manafov would have received a more favorable result without
> Simmons's testimony.  The evidence that Manafov was the robber in both the Valero and
> Chevron robberies was overwhelming.  Indeed, Manafov concedes as much if, as we
> have held, the evidence of the uncharged crimes was properly admitted.  McIntyre
> identified Manafov as the Chevron robber, and Grewal identified his gun in the Valero
> robbery.  The same red car, a car registered to Manafov, was used in all the robberies.  As
> explained ante, the numerous similarities between the robberies supported the inference
> that the same person committed all of them.  Further, the jury watched the surveillance
> videos of the Valero and Chevron robberies, just as Simmons did, and the information
> about which he testified was as available to the jury to view directly as it was to
> Simmons.  Even Simmons's improper inferences that the same robber committed these
> two robberies were clearly based on facts readily apparent to anyone viewing the two
> videos.  Thus, absent Simmons's improper testimony, the jury would still have reached
> the same conclusion that Manafov was the robber in both robberies.

*Manafov*, 2013 WL 5414106, at *15 (citation omitted).

      This conclusion is both reasonable and fully supported by the record.  The error here was

hardly prejudicial as Manafov "was trapped by evidence of an overwhelming quantity both

direct and circumstantial.  The addition of [Simmons'] testimony was but a small fraction of all

that enmeshed" Manafov.  *See United States v. Burke*, 506 F.2d 1165, 1170 (9th Cir. 1974).

Manafov thus fails to establish prejudice, and he is not entitled to relief on this claim either.

B.    _Ineffective Assistance of Counsel_ (Ground 2)

Manafov additionally claims that trial counsel rendered ineffective assistance.  To demonstrate ineffective assistance of counsel under _Strickland v. Washington_, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  _Id._

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  _Lafler v. Cooper_, 132 S. Ct. 1376, 1385-86 (2012); _Glover v. United States_, 531 U.S. 198, 203-04 (2001); _Williams_, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the _Strickland_ prejudice standard is applied and federal courts do not engage in a separate analysis applying the _Brecht_ harmlessness standard.  _Avila v. Galaza_, 297 F.3d 911, 918, n.7 (9th Cir. 2002); _see also Musalin v. Lamarque_, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the _Strickland_ standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the _Strickland_ standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

_Knowles v. Mirzayance_, 556 U.S. 111, 123 (2009) (citations omitted); _see also Runningeagle v. Ryan_, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Manafov must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability

-12-

that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,*
474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the
petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See
Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not
address both prongs if the defendant fails on one).

      1.      Failure to timely move for admission of Rice's jail note

Manafov first faults counsel for failing to file a timely and well-supported motion
requesting the admission of Rice's jail note to support Manafov's duress defense.  At trial, Rice
unsuccessfully sought to exclude the seized note, but the court admitted it to show his
consciousness of guilt.  At the time of Rice's motion, Manafov's counsel indicated that it might
be relevant to his client's state of mind.  The trial directed counsel to file a motion in limine and
include points and authorities if he wished to have that issue considered.  After the People rested
the case against Manafov, counsel asked to admit the note to show that Rice had threatened
Manafov.  The court declined to admit the note for that purpose.

Manafov contends that the court declined to admit the note because counsel's request
was untimely and did not provide legal support.  But the record indicates that, although the trial
court reminded counsel that the request should have been made by written motion filed before
trial, the court did its own research and found "no evidentiary basis to allow that evidence on
behalf of Mr. Manafov."  The court explained that, because the note was written two months
after the robberies, it had no bearing on Manafov's state of mind when the robberies occurred.
The record therefore fully supports the Court of Appeal's determination that "Manafov has not
shown a more effective counsel would have succeeded in admitting the note in his case."

*Manafov*, 2013 WL 5414106, at *13.  Likewise, the Court of Appeal's alternative conclusion

that Manafov failed to demonstrate prejudice from the failure to admit the note is both

reasonable and fully supported by the record.  Manafov's ineffective assistance claim based on

the jail note therefore fails.

2.      Presenting multiple defenses

Manafov also contends that trial counsel "failed to present a coherent defense theory."

Manafov alleges that trial counsel's presentation of legal necessity and intoxication defenses

diluted his only viable defense of duress.  The Court of Appeal disagreed with Manafov on direct

appeal:

> While Manafov presented evidence (his and Rivers's testimony) that he and
> Rivers feared Rice, Rice had made some threats and once hit Manafov, and Rice
> "harassed" Rivers, there was no evidence that Manafov reasonably believed there was an
> immediate threat to his or Rivers's life when Manafov went into the gas stations to
> commit robbery.  As the People pointed out, Manafov possessed the only gun among the
> three and he never tried to get away from Rice or call for help.  Trial counsel described
> Manafov's testimony on the issue of defense as a "fortress," and unsuccessfully moved
> for a judgment of acquittal on that basis.  The trial court, however, found the argument
> that Manafov was a victim "bordering on offensive."  "The jury didn't buy the defense of
> duress, and neither does the court."  Given the weak evidence of duress and the strong,
> indeed overwhelming, evidence of Manafov's guilt, a different result was not reasonably
> probable if trial counsel had focused exclusively on the defense of duress.

*Manafov*, 2013 WL 5414106, at *14.

As the Court of Appeal reasonably concluded, the record reflects that the evidence of

duress was quite weak.  It is not reasonably likely that focusing solely on this defense would

have resulted in a better outcome.  Manafov is therefore not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Manafov is not entitled to relief on any ground raised in his Petition.

-14-

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: July 7, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge